[752 NYS2d 362]

DANIELLE THOMAS, Appellant, v ERSKINE ALLEYNE et al., Respondents, et al., Defendant.

Second Department, December 16, 2002

## APPEARANCES OF COUNSEL

*Simonson Hess & Leibowitz, P.C.,* New York City (*Paul Simonson* of counsel), for appellant.

*Bower, Sanger & Lawrence, P.C.,* New York City (*Steven J. Zaloudek* of counsel), for Erskine Alleyne, respondent.

*Carlucci Giardina & Farrell, LLP,* New York City (*Jerry Giardina* of counsel), for Interfaith Medical Center, respondent.

## OPINION OF THE COURT

PRUDENTI, P.J.

Pursuant to CPLR 3101 (d) (1) (i), the plaintiff in a medical malpractice case must, upon demand, disclose the qualifications of his or her prospective expert witness. In this case, the plaintiff argues that full compliance with this statutory mandate would enable the defendants to learn the identity of her expert, and that she should therefore be required to disclose none of her expert's qualifications other than (1) whether her expert is "board certified," and, if so, by what board or boards, and (2) the identity of all states in which her expert is licensed to practice (*see e.g. Duran v New York City Health & Hosps. Corp.,* 182 Misc 2d 232). The plaintiff argues that our decision in *Jasopersaud v Tao Gyoun Rho* (169 AD2d 184) should be overruled to the extent that it requires disclosure of any additional information concerning her expert's qualifications, such as, for example, the institutions attended by her expert in connection with his or her medical education, internship, and residency.

We agree with the plaintiff that our decision in *Jasopersaud v Tao Gyoun Rho (supra)* should be reexamined in light of current conditions. However, while we agree with the plaintiff that the holding of the *Jasopersaud* case must be reconsidered, we believe that the holding of that case was, if anything, unduly restrictive of the discovery authorized under New York law in respect to the qualifications of the experts proposed to be called at trial by the various parties. Under the approach taken in *Jasopersaud (supra),* defendants were foreclosed from obtaining disclosure to which they would otherwise have had a statutory right, merely because such disclosure would have, or at least might have, led to revelation of the identity of the plaintiff's expert. We now abandon that approach as being both unworkable and inconsistent with the terms of the governing statute, and hold that defendants in medical malpractice actions are presumptively entitled to a statement of the plaintiff's

expert's qualifications in "reasonable detail" (CPLR 3101 [d] [1] [i]), as the statute commands, and that the plaintiffs in such cases may avoid compliance with this obligation only upon production of proof sufficient to sustain findings (a) that there is a reasonable probability that such compliance would lead to the disclosure of the actual identity of their expert or experts, and (b) that there is a reasonable probability that such disclosure would cause such expert or experts to be subjected to "unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice" (CPLR 3103 [a]).

By notice dated November 27, 2000, the respondent Interfaith Medical Center (hereinafter Interfaith) demanded that the plaintiff provide, among other things, a statement of the qualifications of each person whom the plaintiff expects to call as an expert witness at the trial of this action. The data requested includes: (1) in the case of a board-certified expert, the name of the certifying board and the year of certification, (2) the states in which the expert is licensed, (3) the title of any text authored, contributed to, or edited by, the expert, together with an appropriate citation (by name of publication, volume number, date, or other appropriate identifying matter), (4) the undergraduate school attended by such expert, with year of graduation, (5) the medical school attended by such expert, with the year of graduation, and (7) the institutions attended by the expert in connection with any internship, residency, fellowship, or other specialized training, and the dates of such attendance.

In a less-detailed notice dated August 22, 2001, the respondent Erskine Alleyne, M.D., demanded that the plaintiff state the qualifications of each expert witness that the plaintiff intends to call at trial.

By notice of motion dated October 9, 2001, the plaintiff sought a protective order with respect to these demands. In his affirmation in support of the motion, counsel asserted that he, or someone under his guidance, entered into a computer terminal various data relating to the plaintiff's expert's (1) state of licensing, (2) board certifications, (3) medical school background, (4) place of internship, and (5) place of residency. According to counsel, the processing of this information by the computer, in accordance with an appropriate program, was sufficient for the operator of the computer terminal to discover, with relative ease, the identity of one single physician who was, in fact, the plaintiff's proposed expert.

Based on this experiment, and based on similar experiments conducted by entering into the computer certain data derived

from the curriculum vitae of a presumably typical physician taken as a model, counsel argued that the plaintiff's compliance with the discovery demands made by Interfaith, would permit the defendants to identify the plaintiff's expert "with a few simple key strokes." Counsel asserted that the plaintiff should be compelled to disclose no more than her proposed expert's states of licensing and board certification status, because this, according to counsel, "is all that trial lawyers need to prepare for trial." Based on counsel's computer-based experiments, at least 1,000 physicians share the board certification status and state of licensing status particular to the plaintiff's chosen expert.

The defendants opposed the plaintiff's motion for a protective order. Interfaith cross-moved to compel compliance with its demand. In large measure, the affirmations submitted by counsel focus on the proper interpretation to be given to this Court's prior decision in *Jasopersaud v Tao Gyoun Rho (supra)* in light of the simplification and proliferation of computer technology that has occurred since the date of that decision. The expansion of this technology, according to the plaintiff's counsel, now permits anyone, or at least anyone possessing the will and the modest amount of expertise necessary, to determine, based on a full and accurate statement of a particular physician's credentials, exactly who that physician is.

The Supreme Court, following *Jasopersaud*, granted Interfaith's cross motion to compel disclosure only to the extent of directing that the plaintiff would be required to disclose (1) the medical school attended by the expert, (2) the board or boards, if any, that have certified the expert, (3) the area of the expert's specialty, (4) the jurisdiction or jurisdictions in which the expert is licensed to practice, and (5) the location of the expert's internships, residencies, and fellowships. The Supreme Court granted the plaintiff's motion for a protective order to the extent of, in effect, vacating so much of the defendants' notices as called for the production of any additional information concerning the qualifications of the plaintiff's expert. In its decision, the Supreme Court explained that, in making the foregoing dispositions, it was following the decision of this Court in *Jasopersaud* even though the continued vitality of that case has been called into question. The Supreme Court stated, in part:

> "Plaintiff now seeks to revise the *Jasopersaud* decision to further limit disclosure to essentially only

the licensing state and board certifications. Current computerized search engines utilizing the minimal amount of information that *Jasopersaud* authorizes can often apparently compromise or render futile protecting an expert's identity. Hence some coordinate lower court decisions recognize this technological phenomenon and regard *Jasopersaud*, decided a decade ago, as either anachronistic * * * 'stale case law' regarding the extent of disclosable information * * * or as tilting the balancing test to make its applicability either 'inoperable,' 'impossible,' or 'improbable' (citations omitted). * * * The court also recognizes that reasserting or tinkering with *Jasopersaud* remains the province of the Appellate Division * * * just as reexamining CPLR 3101 (d) (1) (i) itself remains for the Legislature."

The plaintiff appeals.

CPLR 3101 (d) (1) (i) states, in relevant part, that "[u]pon request, each party *shall* identify each person whom the party expects to call as an expert witness at trial and *shall* disclose in reasonable detail * * * the qualifications of each expert witness" (emphasis added). The use of the mandatory verb forms "shall identify" and "shall disclose" leaves no doubt as to the meaning of this portion of the statute.

The statute goes on to create an exception applicable in medical, dental, and podiatric malpractice cases, in that in such cases the expert's *name* need not be disclosed. The statute sets forth *no exception* to the requirement that, upon demand, the qualifications of the parties' experts be set forth in "reasonable detail." On the contrary, the statute specifies that the exception applies only in such a way as to permit (but not require) omission of the expert's name. Specifically, the last sentence of CPLR 3101 (d) (1) (i) states, in part, "[i]n an action for medical, dental or podiatric malpractice, a party, in responding to a request, *may* omit the *names* of medical, dental or podiatric experts but shall be *required to disclose all other information concerning such experts otherwise required by this paragraph*" (emphasis added).

We begin, then, with the observation that the statute, read literally, requires that the qualifications of each party's expert witnesses be set forth in "reasonable detail" in all cases, without exception. To the extent that there is any rule to the effect that a plaintiff in a medical malpractice action, in

responding to a demand that he or she describe his or her proposed expert's qualifications, need not provide any data that would allow for relatively effortless determination of such expert's identity, such rule is entirely the product of case law (*see Jasopersaud v Tao Gyoun Rho, supra; see also Thompson v Swiantek,* 291 AD2d 884; *Morris v Clements,* 228 AD2d 990; *Yablon v Coburn,* 219 AD2d 560).

Prior to this Court's decision in *Jasopersaud v Tao Gyoun Rho (supra),* there was a divergence of viewpoints. For example, in *Catino v Kirschbaum* (129 AD2d 758), this Court stated, "[w]hile CPLR 3101 (d) (1) (i) grants a party the right to not disclose the name of a prospective medical expert, its underlying purpose is not to preclude any possibility of identifying an adversary's medical expert in a medical * * * malpractice action." The *Catino* Court's interpretation of CPLR 3101 (d) (1) (i), according to which the statute contemplates the possibility that the identity of a plaintiff's expert might indirectly be revealed as the result of disclosure, in adequate detail, of that expert's qualifications, is wholly consistent with the terms of the statute *(supra).* However, the *Catino* Court's view had earlier been contradicted, at least in dicta, by the Appellate Division, Third Department, in *Pizzi v Muccia* (127 AD2d 338), and was later contradicted by this Court as well, in *Jones v Putnam Hosp. Ctr.* (133 AD2d 447). In *Jones (supra),* this Court held that it would be "palpably improper" to permit disclosure of an expert's qualifications under circumstances where such disclosure would "effectively" permit determination of such expert's identity.

It was against this backdrop that *Jasopersaud v Tao Gyoun Rho (supra)* was decided in 1991. In *Jasopersaud,* the Court examined a demand made by certain defendants for a statement of the plaintiff's expert's qualifications that was in some ways similar to that served upon the plaintiff by Interfaith in this case. However, the notice served in that case did not include any demand for information analogous to Interfaith's demand relating to scholarly (or other) articles written, contributed to, or edited by the plaintiff's expert (*Jasopersaud v Tao Gyoun Rho, supra* at 185). The Court in *Jasopersaud* determined that the defendants in that case were entitled to disclosure of: (1) the expert's board certifications (but not the date attained), (2) the jurisdictions in which the expert was licensed (but not the date of licensing), (3) the medical school attended by the expert (but not the date of graduation), (4) the expert's areas of expertise, (5) the institutions in which the

expert served in connection with any internship, residency, or fellowship (but not the dates of such service).

In *Jasopersaud*, the Court also held that the defendants in that case were not entitled to disclosure of the hospitals with which the expert was affiliated at the time of the litigation.

In *Jasopersaud*, the Court explained its basic reason for directing disclosure of some, but not all, of the qualifications of the plaintiff's expert in that case, stating that a proper exercise of discretion called for the exemption from disclosure of such data as would, "under the circumstances * * * tend to reveal the identity of the plaintiff's expert" (*Jasopersaud v Tao Gyoun Rho, supra* at 188). It is not clear how the Court determined exactly what information would have been so useful to the defendants in that case in furthering their presumed efforts to determine the identity of the plaintiff's expert's as to warrant the exemption from disclosure of such information; presumably, the plaintiff in that case made a showing analogous to that made by the plaintiff herein. The Court expressly overruled its precedent in *Catino v Kirschbaum (supra)*.

*Jasopersaud* does not stand for the proposition that, in all medical malpractice cases, the plaintiff may never be required to make disclosure with respect to the qualifications of his or her medical expert in any greater detail than would be accomplished by a response in the five specific areas noted above. Rather, *Jasopersaud* holds that the defendant is presumptively entitled to a full and "reasonable detailed" statement of the qualifications of the plaintiff's expert, but that the court, in its discretion, may excuse full compliance by the plaintiff where it is demonstrated that such full compliance would "effectively" reveal the identity of the expert, *and* where the interest of the plaintiff in postponing revelation of his or her expert's identity until the time of trial outweighs the countervailing interest of the defendant in receiving full disclosure. The Court stated that "each case will necessarily vary," and that the Supreme Court "must weigh * * * the competing concern [s]" of (1) the defendant's interest in full disclosure, and (2) the plaintiff's interest in preserving the anonymity of his or her expert. (*Id.* at 188.) The *Jasopersaud* case does not exclude the possibility that the latter interest should, in circumstances different from those under review in *Jasopersaud* itself, be sacrificed to the former one, where, for example, the defendant demonstrates a particularly compelling need to discover an aspect of the proposed expert's qualifications which would, if disclosed, "effectively" reveal such expert's identity.

The practical difficulty with the balancing approach reflected in the *Jasopersaud* case is that it requires, on a case-by-case basis, (1) an assessment of the strength of the defendant's interest in full disclosure of the plaintiff's expert's qualifications, (2) an assessment of the strength of the plaintiff's countervailing interest in the temporary preservation of such expert's anonymity until the time of trial, and (3) a determination as to which interest is weightier. The *Jasopersaud* approach also requires a determination as to what data would, or might, if disclosed, "effectively" result in the identification of a plaintiff's proposed expert. In certain cases (e.g., that of a physician licensed in both the United States Virgin Islands and Guam, or that of a physician board certified in both ophthalmology and psychiatry), it is not difficult to imagine that the disclosure of even the minimal amount of information offered by the plaintiff in this case might lead to, or at least facilitate, identification of a prospective expert. On the other hand, a defendant might have a very strong, and entirely legitimate, interest in discovering that the plaintiff's expert authored a particular article, where, for example, the subject of the article relates to the issues to be decided at trial. This circumstance might, even under the "balancing" test defined in *Jasopersaud*, warrant disclosure of the title of and citation for such article, even though this would obviously result in disclosure of the expert's name.

We agree with the plaintiff that, in light of the expansion of computer technology, it has become markedly easier for attorneys, or their employees, to perform various research functions that, at the time of the enactment of CPLR 3101 (d) (1) (i) in 1985 (L 1985, ch 294, § 4) would have required significantly more time and effort. While it was undoubtedly possible, even then, for anyone willing to expend the necessary time and resourceful enough to locate the necessary directories, to determine the identity of an unknown physician based on a limited quantity of information known about such physician's background, that task is now vastly simplified as the result of computer technology. The plaintiff argues that the law should recognize this technological change by further limiting defendants' right to the disclosure of background information relating to a medical malpractice plaintiff's expert's qualifications. We believe, instead, that this technological change points to the futility of attempting to conceal the identity of expert witnesses in medical malpractice cases, or in any other kind of case for that matter.

Virtually every jurisdiction in the United States except New York, conforming to the Federal Rules of Civil Procedure in this respect, allows the discovery of the names of adverse expert witnesses in medical malpractice cases through depositions or interrogatories; many states go so far as to permit depositions of such experts (*see* Richard S. Basuk, Note, *Expert Witness Discovery for Medical Malpractice Cases in the Courts of New York: Is it Time to Take Off the Blindfolds?*, 76 NYU L Rev 1527, 1528 n 6 [2001]; *see also* Silber and Rabar, *Expert Disclosure: Still No Consensus*, NYLJ, Sept. 17, 2002, at 3, col 1). New York's rule, which, contrary to the federal rules, permits parties in medical malpractice cases temporarily to conceal the identity of their expert witnesses, is contrary to the salutary policy of encouraging full pretrial disclosure so as to advance the fundamental purpose of litigation, which is to ascertain the truth (*see* Barker, *More on Medical Experts*, NYLJ, Nov. 15, 1999, at 3, col 1; Barker, *Disclosure in Medical Malpractice Cases*, NYLJ, Oct. 18, 1999, at 3, col 1; Dembin and Yun, *Medical Expert Witness Disclosure under CPLR: An Anachronism,* NYLJ, Dec. 1, 1997, at 1, col 1).

In his Note cited above, Dr. Basuk discusses the *Jasopersaud* case (*supra*) and states that the "balance" which the Court strove to obtain in that case has become even more "elusive," because "in the current world of computer technology and databases, parties have the ever-increasing ability to use qualifications to identify an adversary's expert" (*see* Richard S. Basuk, Note, *Expert Witness Discovery for Medical Malpractice Cases in the Courts of New York: Is it Time to Take Off the Blindfolds?*, 76 NYU L Rev 1527, 1544 [2001]). We agree, and we believe that the balancing approach employed in the *Jasopersaud* case is no longer workable (*see Esquilin v Brooklyn Hosp. Ctr.—Downtown Campus,* 190 Misc 2d 753; *Engel v Defeo,* 189 Misc 2d 673, 676 [describing the "balancing test" of *Jasopersaud* as "inoperable"]; *Deitch v May,* 185 Misc 2d 484, 488 [describing the holding of *Jasopersaud* as "stale case law"]; *Duran v New York City Health & Hosps. Corp., supra*).

History has demonstrated the wisdom of the literal interpretation of the statute reflected in *Catino v Kirschbaum (supra),* the case that was expressly overruled in *Jasopersaud.* History has also demonstrated the futility of attempting to limit the disclosure to which a defendant is rightfully undoubtedly entitled under the mandatory statutory language in order to safeguard *not* the plaintiff's option to refrain from disclosing

his or her expert's name (a right which the statute recognizes, and is not impaired in the slightest by our holding in this case) but rather the "right" of a plaintiff to guarantee that the identity of his or her expert is never discovered through other completely legitimate channels (a "right" which the statute does not recognize). The balancing test in *Jasopersaud*, while pragmatically malleable in its day, is now elusive to the point of unworkability, as reflected in the repeated statements of perplexity that can be found in various opinions of the Supreme Court (*see Esquilin v Brooklyn Hosp. Ctr.—Downtown Campus, supra; Engel v Defeo, supra; Deitch v May, supra* at 488; *Duran v New York City Health & Hosps. Corp., supra; see also Brosnan v Shaffron,* NYLJ, May 3, 2001, at 23, col 6).

The policy underlying the Legislature's enactment of a statute that permitted litigants in medical, dental, or podiatric malpractice cases (but not litigants in, for example, cases based instead on architectural, accounting, or legal malpractice) to omit the name of their proposed expert when making disclosure, and thus to postpone revelation of the expert's identity until the time of trial, was apparently based on a "concern that medical experts might be discouraged from testifying by their colleagues" (*Ryan v Michelsen,* 241 AD2d 434, 435; *see Wagner v Kingston Hosp.,* 182 AD2d 616; *Jasopersaud v Tao Gyoun Rho, supra* at 187; *Rubenstein v Columbia Presbyt. Med. Ctr.,* 139 Misc 2d 349, 352; *McGoldrick v Young Health Ctr.,* 135 Misc 2d 200). The Legislature presumably concluded either that (1) the class of experts in medicine who render their services to plaintiffs in medical malpractice cases are, for some reason, measurably more sensitive to whatever pressures might be exerted on them by their colleagues than are, for example, the class of experts in law, architecture, or accounting who render similar services, or (2) doctors, as a class, are somehow more aggressive in applying such pressure on their colleagues who might also serve as expert witnesses than are, for example, lawyers, architects, or accountants. Assuming that this distinction has a rational basis at all, it is certainly not such a forceful one as to warrant, for reasons of "policy," a departure from a literal construction of CPLR 3101 (d) (1) (i), which requires disclosure, in "reasonable detail," of the qualifications of all experts, medical or otherwise, expected to testify at trial.

Although, for the foregoing reasons, we conclude that defendants will ordinarily be entitled to full disclosure of the qualifications of a plaintiff's expert, notwithstanding that such disclosure may permit such expert's identification, this does

not prevent a plaintiff from seeking a protective order under the provisions of CPLR 3103 (a). According to this statute, the court "may at any time on its own initiative, or on motion of any party or [witness], make a protective order denying, limiting * * * or regulating the use of any disclosure device. Such order shall be designed to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts." Upon a factual showing that there exists a concrete risk, under the special circumstances of a particular case, that a prospective expert medical witness would be subjected to intimidation or threats if his or her name were revealed before trial, then relief may be sought under this statute. In order to make such a showing without revealing the expert's name in doing so, the party seeking such relief may redact the expert's name from any affidavit submitted in support of such a motion, or may submit evidence in camera. The Supreme Court could then decide whether the expert in question has an objectively reasonable belief that, if his or her identity were revealed prior to trial, then he or she would be subject to threats or pressure from other physicians, from representatives of a malpractice insurance carrier, or from any other source.

In the present case, no such showing was made. The defendants thus would ordinarily be entitled to full disclosure of the plaintiff's qualifications, as requested by Interfaith in its demand. Because the defendants have not appealed, so as to preclude the granting of affirmative relief to them (*see* CPLR 5501 [a]; *see e.g. Hecht v City of New York,* 60 NY2d 57; *Schiavoni v Village of Sag Harbor*, 285 AD2d 638; *cf.* CPLR 3212 [b]; *Merritt Hill Vineyards v Windy Hgts. Vineyard,* 61 NY2d 106, 110), the proper course would ordinarily be to affirm the order appealed from.

However, we acknowledge that our departure from our precedent in *Jasopersaud* might be viewed by some as "a sharp break in the web of the law" (*James v Liberty Lines,* 97 AD2d 749, 749; citing *Gurnee v Aetna Life & Cas. Co.,* 55 NY2d 184, 191, *cert denied* 459 US 837; *Gager v White,* 53 NY2d 475, *cert denied sub nom. J.E. Guertin Co. v Cachat,* 454 US 1086; *People v Pepper*, 53 NY2d 213, 219-220, *cert denied* 454 US 967; *Sears Roebuck & Co. v 9 Ave.—31 St. Corp.,* 274 NY 388). Without deciding any issue with respect to the retroactive effect of our decision in this case today, we determine that, in this particular case at least, the interest of justice warrants granting the plaintiff leave to renew her motion for a protective order, if she

be so advised, in order to adduce proof in accordance with the standard outlined above.

For the foregoing reasons, the order appealed from should be modified, on the law, and as a matter of discretion, by adding thereto a provision granting the plaintiff leave to renew her motion for a protective order upon production of proof sufficient to sustain findings that (a) there is a reasonable probability that such compliance would lead to the disclosure of the actual identity of her expert or experts, and (b) there is a reasonable probability that such disclosure would cause such expert or experts to be subjected to unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice; and as so modified, the order is affirmed insofar as appealed from; and the plaintiff, if she be so advised, shall make such motion for leave to renew within 20 days of the date of service upon her attorneys of a copy of this decision and order, and the plaintiff's obligation to comply with so much of the discovery demands of the defendants as sought disclosure of expert witness qualifications is stayed during such 20-day period and until the hearing and determination of any such motion to renew.

FLORIO, SCHMIDT and MASTRO, JJ., concur.

Ordered that the order is modified, on the law, and as a matter of discretion, by adding thereto a provision granting the plaintiff leave to renew her motion for a protective order upon production of proof sufficient to sustain findings that (a) there is a reasonable probability that such compliance would lead to the disclosure of the actual identify of her expert or experts, and (b) there is a reasonable probability that such disclosure would cause such expert or experts to be subjected to unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice; as so modified, the order is affirmed insofar as appealed from, without costs or disbursements; and it is further,

Ordered that the plaintiff, if she be so advised, shall make such motion for leave to renew within 20 days of the date of service upon her attorneys of a copy of this decision and order; and it is further,

Ordered that the plaintiff's obligation to comply with so much of the discovery demands of the defendants as sought disclosure of expert witness qualifications is stayed during such 20-day period and until the hearing and determination of any such motion to renew.